383 F.3d 49
 Wayne A. KRUSE, Lisa M. McLeod, Robert Schill, David Legro, Barbara Legro, on behalf of themselves and all others similar situated, Plaintiffs-Appellants,
v.
WELLS FARGO HOME MORTGAGE, INC., WFC Holdings Corporation, Wells Fargo & Company, Wells Fargo Financial, Inc., Defendants-Appellees.
 No. 03-7665.
 United States Court of Appeals, Second Circuit.
 Argued: February 11, 2004.
 Decided: September 10, 2004.
 
 Appeal from the United States District Court for the Eastern District of New York, Isreal Leo Glasser, J. COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Michael C. Spencer, Milberg Weiss Bershad Hynes & Lerach LLP (Susan M. Greenwood; Craig H. Johnson, Lon D. Packard, Joann Shields, Packard, Packard & Johnson, Salt Lake City, UT; of counsel), New York, NY, for Appellants.
 Thomas M. Hefferon, Goodwin Proctor LLP (Leonard F. Lesser, Goodwin Procter LLP, New York, NY, of counsel), Washington, DC, for Appellees.
 Christine N. Kohl, U.S. Department of Justice (Michael J. Singer; Peter D. Keisler, Assistant Attorney General; Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York; Richard A. Hauser, Peter S. Race, Joan L. Kayagil, U.S. Department of Housing and Urban Development; of counsel), Washington, DC, for Amicus Curiae the United States.
 Before: JACOBS, SACK, and RAGGI, Circuit Judges.
 SACK, Circuit Judge.
 
 
 1
 In a complaint filed in the United States District Court for the Eastern District of New York, the plaintiffs allege that certain billing practices of the defendant home-mortgage providers with respect to their provision of real estate settlement services to the plaintiffs were contrary to the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA"), in particular RESPA § 8(b) (codified at 12 U.S.C. § 2607(b)). RESPA § 8(b) provides:
 
 
 2
 No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.
 
 
 3
 Id. § 2607(b). The district court (I. Leo Glasser, Judge), concluding that the practices in question were not prohibited by RESPA, granted the defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and dismissed the complaint.
 
 BACKGROUND
 
 4
 According to the complaint, the plaintiffs Wayne A. Kruse, Lisa M. McLeod, and Robert Schill are homeowners who obtained settlement services from the defendants while financing their purchases of homes in Brooklyn, New York. The plaintiffs David and Barbara Legro obtained settlement services from the defendants while refinancing their home in Santa Rosa, California. According to the complaint, the defendants Wells Fargo Financial Services, Inc., and Wells Fargo Home Mortgage, Inc., are wholly owned subsidiaries of the defendant Wells Fargo & Company, which is in turn a wholly owned subsidiary of WFC Holdings Corporation.[1]
 
 
 5
 The complaint further alleges that between February and April 2002, each of the plaintiffs, while obtaining federally related home mortgage loans, was required by the defendants to purchase certain "settlement services," see id. § 2602(3),[2] including "tax service, flood certification, document preparation, and underwriting," Compl. ¶ 23.
 
 
 6
 The plaintiffs challenged two categories of commercial practices adopted by the defendants relating to the provision of settlement services, which the plaintiffs call "overcharges" and "mark-ups." "Overcharges" arise out of settlement services provided by the lender itself but charged to consumers seeking home mortgages for substantially more than the provider's cost. Specifically, the plaintiffs allege that the defendants performed underwriting services — which in this case consist of analyzing a borrower's ability to repay the loan in order to determine whether the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac") will guarantee to purchase the loan on the secondary market, removing most of the lender's risk on the loan — using automated software obtained from Fannie Mae and Freddie Mac at a cost of $20 per loan underwritten. The defendants are said to have charged home mortgage borrowers as much as twenty-five times that amount for the service.
 
 
 7
 A settlement service provider "marks up" the fee for a settlement service when the provider outsources the task of providing the service to a third-party vendor, pays the vendor a fee for the service, and then, without providing an additional service, charges homeowners seeking mortgages a higher fee for the settlement service than that which the provider paid to the third-party vendor. In this case, the defendants are alleged to have paid third parties to perform tax services, flood certification, and document preparation, and then, without providing further services, to have charged plaintiffs amounts substantially in excess of the amount the defendants paid to the third parties for the services. For example, the plaintiffs alleged that the defendants outsourced document preparation to third parties at a typical per-service cost to the defendants of $20 to $50, and then, without performing any additional services, charged consumers seeking home mortgages $150 to $300 for the service.
 
 
 8
 On May 24, 2002, relying on a statement of policy issued by the United States Department of Housing and Urban Development ("HUD") stating that both overcharges and mark-ups violate section 8(b), see Statement of Policy 2001-1, 66 Fed. Reg. 53,052, 53,057-58 (Oct. 18, 2001) (the "Policy Statement"), the plaintiffs filed a putative class action pursuant to Federal Rule of Civil Procedure 23 in the United States District Court for the Eastern District of New York. The action was brought by and on behalf of the plaintiffs and similarly situated persons who, on or after January 1, 1995, received automated underwriting scores indicating that their loans would be guaranteed for purchase by Fannie Mae and Freddie Mac, and who paid fees to the defendants for any of the settlement services described above. The plaintiffs assert that the proposed class consists of thousands of residential mortgage borrowers, that common questions of law and fact predominate, and that the plaintiffs' claims are typical of those of the class. The plaintiffs seek treble damages pursuant to RESPA § 8(d)(2) (12 U.S.C. § 2607(d)(2)) for defendants' asserted violations of section 8(b). The plaintiffs also allege unjust enrichment on the part of the defendants, apparently as a supplemental claim under state law, and request disgorgement of funds in an amount equal to the amount by which the defendants were unjustly enriched.
 
 
 9
 On April 8, 2003, the defendants moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) with respect to the plaintiffs' section 8(b) claim. In a decision delivered orally from the bench on May 16, 2003, an order issued on May 22, 2003, and a judgment entered on May 29, 2003, the district court granted the defendants' motion in its entirety, dismissing the plaintiffs' section 8(b) claim with prejudice. In reaching this decision, the district court relied heavily on the interpretation of section 8(b) advanced by the three federal courts of appeals that had, at the time of the district court's ruling, decided for defendants in litigation in which similar claims were alleged. See Haug v. Bank of Am., 317 F.3d 832 (8th Cir.2003); Krzalic v. Republic Title Co., 314 F.3d 875 (7th Cir.2002), cert. denied, 539 U.S. 958, 123 S.Ct. 2641, 156 L.Ed.2d 656 (2003); Boulware v. Crossland Mortgage Corp., 291 F.3d 261 (4th Cir.2002). The district court agreed with the conclusion of these circuits that section 8(b) unambiguously does not apply to mark-ups and overcharges, and that HUD's interpretation of the section to the contrary was either an impermissible one or entitled to no deference. During the pendency of this appeal, though, the Eleventh Circuit, in Sosa v. Chase Manhattan Mortgage Corp., 348 F.3d 979 (11th Cir.2003), advanced a textual interpretation of section 8(b)'s language at odds with that expressed in Haug, Krzalic, Boulware, and the district court in the instant case.
 
 
 10
 Having dismissed the federal RESPA claim, the district court declined, pursuant to 28 U.S.C. § 1367(c), to exercise supplemental jurisdiction over the plaintiffs' state-law claims, dismissing them without prejudice.
 
 
 11
 The plaintiffs appeal.
 
 DISCUSSION
 I. Standard of Review
 
 12
 We review the judgment of the district court de novo, both because it was a judgment on the pleadings rendered pursuant to Federal Rule of Civil Procedure 12(c), Hardy v. N.Y. City Health & Hosps. Corp., 164 F.3d 789, 792 (2d Cir.1999), and because it involved questions of statutory construction, United States v. Koh, 199 F.3d 632, 636 (2d Cir.1999), cert. denied, 530 U.S. 1222, 120 S.Ct. 2235, 147 L.Ed.2d 264 (2000). "Moreover, the question of the appropriate level of deference to accord agency regulations is one purely of law, subject to de novo review." Coke v. Long Island Care at Home, Ltd., 376 F.3d 118, 122 (2d Cir.2004).
 
 II. Framework of the Analysis
 
 13
 The plaintiffs allege that they are the victims of two of the defendants' practices — overcharges and mark-ups — that they argue violate RESPA § 8(b). In addressing these allegations, we begin as we must with the text of the statute. The initial question is whether or not the statute clearly and unambiguously prohibits the practices of which the plaintiffs complain. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); accord Household Credit Servs., Inc. v. Pfennig, ___ U.S. ___, 124 S.Ct. 1741, 1747, 158 L.Ed.2d 450 (2004) (quoting Chevron).
 
 
 14
 If the provisions of the statute are unclear or ambiguous, then, because the Policy Statement addresses the questions of statutory interpretation here in issue, we must decide whether to defer to HUD's reading of them as reflected in the Policy Statement. If we decide that we are to defer, we must then decide the appropriate level of deference. Compare Chevron, 467 U.S. at 843-44, 104 S.Ct. 2778 (calling for mandatory deference, in certain situations, to "permissible" agency interpretations), with Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (requiring deference, in other situations, to the extent of the interpretations' persuasiveness).
 
 
 15
 If Chevron deference is required, we must defer to the interpretation HUD advances unless it is "`arbitrary, capricious, or manifestly contrary to the statute.'" Household Credit Servs., 124 S.Ct. at 1743 (quoting Chevron, 467 U.S. at 844, 104 S.Ct. 2778); accord Evangelista v. Ashcroft, 359 F.3d 145, 150 (2d Cir.2004) (same). So long as "the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer the court would have reached if the question initially had arisen in a judicial proceeding." Regions Hosp. v. Shalala, 522 U.S. 448, 457, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998) (citation and internal quotation marks omitted). Were we to conclude that the statute is ambiguous but decide that no deference to the agency's interpretation is required, then, of course, we would resolve the ambiguity ourselves using the customary means of judicial statutory interpretation.
 
 III. Overcharges[3]
 
 16
 The plaintiffs urge us to defer to the view taken by HUD in the Policy Statement. HUD has concluded that charging "unreasonably" high prices for certain settlement services, as the plaintiffs assert the defendants did with respect to services the defendants provided to them, is a violation of section 8(b).[4] Under this reading of the statute, the amount by which a fee (or "charge") for a service exceeds the "reasonable value" of the service provided in return is the "portion, split, or percentage" of the charge that is "other than for services actually performed" and thus in violation of section 8(b).
 
 
 17
 We do not think that the text of section 8(b) can bear that interpretation. Section 8(b) does prohibit the "giv[ing] and... accept[ing of] any portion, split, or percentage of any [covered] charge made or received ... other than for services actually performed." RESPA § 8(b), 12 U.S.C. § 2607(b). But nothing in that language authorizes courts to divide a "charge" into what they or some other person or entity deems to be its "reasonable" and "unreasonable" components. Whatever its size, such a fee is "for" the services rendered by the institution and received by the borrower.
 
 
 18
 It would, moreover, be an odd reading of the statute to conclude that it instructs federal courts to award treble damages, see RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2), for "unreasonable" charges made by financial institutions without giving those courts so much as a hint as to how to differentiate between what is and is not "reasonable." There is nothing in the language of section 8(b) to suggest that Congress meant for us to create such a regulatory regime out of whole cloth.
 
 
 19
 We conclude that section 8(b) clearly and unambiguously does not extend to overcharges.
 
 
 20
 Whether it is appropriate for us to consider RESPA's legislative history in determining at the outset whether the statute is clear and unambiguous on this point is not at all clear. See, e.g., Coke, 376 F.3d at 127 ("[T]he Supreme Court has issued mixed messages as to whether a court may consider legislative history at ... step one of Chevron [analysis]."); id. n. 3 (collecting cases).[5] We note nonetheless that, as pointed out by Haug v. Bank of America, 317 F.3d at 832, our text-based conclusion is supported by the legislative history of RESPA.
 
 
 21
 Prior to passage of RESPA, Senator Proxmire submitted a separate bill proposing that HUD be empowered to "establish the maximum amounts of the charges to be imposed upon the borrower and seller for services incident to or a part of a real estate settlement ... which shall be designed to reflect the reasonable charges for necessary services ... and to assure that settlement costs do not exceed such reasonable charges...." A Bill to Regulate Closing Costs and Settlement Procedures in Federally Related Mortgage Transactions, S. 2288, 93d Cong. § 4(a)(1) (1973); see also 119 Cong. Rec. 26,548-49 (1973) (describing Senator Proxmire's bill as "direct[ing] HUD to issue regulations to limit the amount of closing costs which can be charged in each section of the country"). Congress did not adopt this explicit price-control proposal. Instead, it directed HUD to report to Congress on "whether Federal regulation of the charges for real estate settlement services in federally related mortgage transactions is necessary and desirable." RESPA, Pub.L. No. 93-533, § 14(b)(2), 88 Stat. 1724, 1730 (1974); id. § 14(a) (requiring that such a report be given by HUD three to five years after the date of RESPA's passage), repealed by Pub.L. No. 104-208, § 2103(h), 110 Stat. 3009-401 (1996). We think the failure of Congress to enact Senator Proxmire's 1973 price-control bill, coupled with its charge to HUD to produce a report on whether such legislation was advisable, provides a persuasive complement to our textually based conclusion that Congress did not intend section 8(b) to serve as a price-control mechanism.
 
 
 22
 We thus conclude that we cannot, and we therefore do not, defer to this reading of section 8(b) by HUD. See Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. Section 8(b) did not impose price controls and therefore does not prohibit "overcharges." Accord Krzalic, 314 F.3d at 881 ("[RESPA] is not a price-control statute."); Boulware, 291 F.3d at 268 ("RESPA was meant to address certain practices, not enact broad price controls.").[6]
 
 
 23
 We affirm the judgment of the district court as to the plaintiffs' overcharges claim.
 
 IV. Mark-Ups
 
 A. The Language of Section 8(b)
 
 
 24
 The plaintiffs also argue that the district court erred in concluding that the defendants' mark-ups do not as a matter of law violate section 8(b). The term "mark-ups" as the plaintiffs use it in this context refers to fees that the defendants allegedly charged to the plaintiffs for settlement services provided by third-party vendors in excess of the fees that the third-party vendors charged to the defendants for those services, "[w]ithout performing any additional services." Compl. ¶ 24. Because HUD's Policy Statement interprets section 8(b) to prohibit mark-ups, see Policy Statement, 66 Fed.Reg. at 53,058-59, our initial inquiry is whether the text of section 8(b) is clear and unambiguous on the issue so as to foreclose our deference to the Policy Statement in this regard.
 
 
 25
 The Fourth, Seventh, and Eighth Circuits have held that the text of section 8(b) clearly and unambiguously does not prohibit mark-ups. Haug, supra; Krzalic, supra; Boulware, supra. These courts reason, inter alia, that the word "and" in section 8(b)'s phrase "no person shall give and no person shall accept" requires that there be both one or more persons who give and one or more persons who receive a settlement services fee other than for services actually performed for there to be a violation of the statute; so that, unless there is at least one giver and one acceptor who simultaneously violate the law, there can be no violation of section 8(b). See Haug, 317 F.3d at 836 ("Section 8(b) ... unambiguously requires at least two parties to share a settlement fee in order to violate the statute."); Boulware, 291 F.3d at 266 ("The use of the conjunctive `and' indicates that Congress was clearly aiming at an exchange or transaction, not a unilateral act."). These courts conclude that reading section 8(b) to apply to mark-ups is therefore absurd because it renders givers of mark-ups — the consumers ostensibly protected by the statute — as well as acceptors — the financial institutions from whose sometime-predatory practices they are being protected — simultaneously guilty of violating the statute. Boulware, 291 F.3d at 265 ("It would be irrational to conclude that Congress intended consumers to be potentially liable under RESPA for paying unearned fees.... [T]he giver in § 8(b) must be some party in the settlement process besides the borrower herself."); Krzalic, 314 F.3d at 879 ("On the plaintiffs' understanding, they themselves violated the statute because they gave [the defendant] a portion of the fee charged by the county recorder!").
 
 
 26
 In Sosa v. Chase Manhattan Mortgage Corp., 348 F.3d 979 (11th Cir.2003), however, the Eleventh Circuit found nothing absurd about a conclusion that section 8(b) covers mark-ups. "The `and' in subsection 8(b) ... operates to create two separate prohibitions.... Giving a portion of a charge is prohibited regardless of whether there is a culpable acceptor, and accepting a portion of a charge is prohibited regardless of whether there is a culpable giver." Id. at 982. The lender can thus be liable for a section 8(b) violation while the borrower is not. And if the lender pays a third party for services and, though performing no additional services itself, charges an additional amount to the borrower, it receives that additional amount "other than for services actually performed," in violation of the statute. See id. at 982-83.[7]
 
 
 27
 The words of the statute do not seem to compel either reading. The different interpretations described above derive largely from divergent, but plausible, constructions of the word "and." We thus conclude, because section 8(b) is not clear and unambiguous with respect to its coverage of mark-ups, that we must determine whether deference is due to HUD's interpretation of the statute as expressed in the Policy Statement.
 
 
 28
 
 B. Deference to HUD's Interpretation of Section 8(b)
 
 
 
 29
 The circumstances under which an agency pronouncement is due mandatory, Chevron deference are not entirely clear.[8] See Richard J. Pierce, Jr., Administrative Law Treatise § 3.5 (4th ed. Supp.2004) (referring to recent Supreme Court decisions on this issue as "confusing"). But such deference is said to be required "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Within this context, formal adjudications and interpretations promulgated by an agency pursuant to notice-and-comment rulemaking are generally accorded Chevron deference. See id. at 230, 121 S.Ct. 2164 ("It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force. Thus, the overwhelming number of our cases applying Chevron deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication." (citation and footnote omitted)).
 
 
 30
 The Policy Statement was not the fruit of notice-and-comment rulemaking. But notice-and-comment rulemaking is not a sine qua non of Chevron deference.
 
 
 31
 Less formal interpretations may also be entitled to mandatory deference, depending upon to what extent the underlying statute suffers from exposed gaps in policies, especially if the statute itself is very complex, as well as on the agency's expertise in making such policy decisions, the importance of the agency's decisions to the administration of the statute, and the degree of consideration the agency has given the relevant issues over time. See Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).
 
 
 32
 Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 137-38 (2d Cir.2002); see also Barnhart, 535 U.S. at 221-22, 122 S.Ct. 1265 (noting that "the fact that the Agency previously reached its interpretation through means less formal than `notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due." (citation omitted)); Mead, 533 U.S. at 231, 121 S.Ct. 2164 ("[T]he want of [notice-and-comment] procedure[s]... does not decide the case."). Applying Mead, Barnhart, and Wilson-Coker, we conclude that Chevron deference is due to HUD's interpretation of section 8(b) with respect to mark-ups.
 
 
 33
 First, "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Mead, 533 U.S. at 226-27, 121 S.Ct. 2164. Congress provided: "The Secretary [of HUD] is authorized to prescribe such rules and regulations, [and] to make such interpretations ... as may be necessary to achieve the purposes of [RESPA]." 12 U.S.C. § 2617(a).[9] The Policy Statement, which was published in the Federal Register, see 66 Fed.Reg. 53,052-59, explicitly identified itself as having been promulgated in the exercise of HUD's congressionally delegated authority:
 
 
 34
 The Department is issuing this Statement of Policy in accordance with 5 U.S.C. 552 as a formal pronouncement of its interpretation of relevant statutory and regulatory provisions. Section 19(a) (12 U.S.C. 2617(a)) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601-2617) (RESPA) specifically authorizes the Secretary "to prescribe such rules and regulations [and] to make such interpretations * * * as may be necessary to achieve the purposes of [RESPA]."
 
 
 35
 Policy Statement, 66 Fed.Reg. at 53,052 (alterations in original). Thus Congress authorized HUD to promulgate rules, regulations, and interpretations with the force of law. We think it clear that the Policy Statement was promulgated in the exercise of that authority.
 
 
 36
 Second, if the Policy Statement arose out of "the careful consideration the Agency has given the question over a long period of time," Barnhart, 535 U.S. at 222, 122 S.Ct. 1265, that would suggest that we are required to defer. Indeed, the Policy Statement did.
 
 
 37
 HUD's initial RESPA regulation, known as Regulation X, was adopted in 1976. See 41 Fed.Reg. 22,702-12 (June 4, 1976) (codified with subsequent amendments at 24 C.F.R. § 3500.1 et seq.) (setting forth HUD's original Regulation X). It did not contain a clear statement of HUD's interpretation of section 8(b). See Echevarria v. Chicago Title & Trust Co., 256 F.3d 623, 627 & n. 1 (7th Cir.2001).[10] In 1992, HUD issued a regulation implementing section 8(b): "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates [RESPA § 8(b)]. The source of the payment does not determine whether or not a service is compensable." See id. at 627 (quoting 24 C.F.R. § 3500.14(c) (2000)); 57 Fed.Reg. 49,600, 49,611 (Nov. 2, 1992) (amending 24 C.F.R. § 3500.14(c)). But this 1992 interpretation also did not clearly state whether mark-ups violate section 8(b).
 
 
 38
 In Echevarria, the Seventh Circuit held that the defendant's mark-up of third-party vendors' fees did not violate section 8(b). It noted, however, that it reached this conclusion in part because, "[a]bsent a formal commitment by HUD to an opposing position, we decline to overrule our established RESPA § 8(b) case law." Echevarria, 256 F.3d at 630. HUD's interpretation of section 8(b) to prohibit mark-ups — that is contained in the Policy Statement, issued in October 2001 — was largely in response to Echevarria. See Policy Statement, 66 Fed.Reg. at 53,052, 53,058 (discussing Echevarria).
 
 
 39
 On the basis of this history, we disagree with the Seventh Circuit's later characterization of the Policy Statement: "One fine day, [it] simply appeared in the Federal Register." Krzalic, 314 F.3d at 881. The Policy Statement was not a set of off-the-cuff remarks, but a response to what was essentially an invitation by the Echevarria court for HUD to clarify its view on the matter. The fact that HUD explicitly designated its interpretation as a response to a judicial decision is some evidence of careful consideration by the agency. And the fact that the Policy Statement was apparently the culmination of HUD's reflections on the meaning of section 8(b) as applied to mark-ups over a period of years is further reason to defer to it.
 
 
 40
 Third, HUD plainly possesses expertise regarding the market for federally related home mortgage loans. The fact that HUD's interpretation here is comfortably within the ambit of that expertise bolsters the argument that we should defer to the Policy Statement. See Barnhart, 535 U.S. at 222, 122 S.Ct. 1265 (listing "the related expertise of the Agency" as a relevant factor in deciding whether to accord Chevron deference); Schuetz v. Banc One Mortgage Corp., 292 F.3d 1004, 1012 (9th Cir.2002) ("Congress authorized the Department to interpret RESPA, HUD has responsibility for enforcing the statute, and it has expertise in the home mortgage lending industry."), cert. denied, 537 U.S. 1171, 123 S.Ct. 994, 154 L.Ed.2d 913 (2003).
 
 
 41
 Fourth, our sister circuits have deferred to the Policy Statement, albeit in the course of determining when "yield spread premiums" violate RESPA § 8(a), 12 U.S.C. § 2607(a), rather than whether mark-ups are covered by section 8(b). See Heimmermann v. First Union Mortgage Corp., 305 F.3d 1257, 1264 (11th Cir.2002), cert. denied, 539 U.S. 970, 123 S.Ct. 2641, 156 L.Ed.2d 675 (2003); Schuetz, 292 F.3d at 1014 (according Chevron deference with respect to treatment of yield spread premiums under RESPA); Glover v. Standard Fed. Bank, 283 F.3d 953, 962-63 (8th Cir.) (according the Policy Statement deference pursuant to Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)), cert. denied, 537 U.S. 943, 123 S.Ct. 344, 154 L.Ed.2d 251 (2002); see also Pierce, supra, § 3.5, at 18-20 (summarizing cases deferring to the Policy Statement). While we do not think that deference to an agency with respect to its interpretation of one portion of a statute necessarily requires our deference with respect to its analysis of another portion, we think these decisions at least support our conclusion that the Policy Statement is a document of sufficient gravity to be worthy of deference.
 
 
 42
 After weighing all these circumstances, we accord Chevron deference to HUD with respect to its analysis of the application of section 8(b) to mark-ups. Cf. Boulware, 291 F.3d at 267 ("Deference might well be due Regulation X or HUD's statement of policy if § 8(b) were ambiguous." (citing Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778)); Heimmermann, 305 F.3d at 1262 (stating with respect to the Policy Statement's interpretation of section 8(a) that, "[g]iven the express delegation of authority in RESPA, formal notice-and-comment is not needed to extend deference to the [Policy Statement]"). But cf. Krzalic, 314 F.3d at 881 ("If an agency is to assume the judicial prerogative of statutory interpretation that Chevron bestowed upon it, it must use ... something more formal, more deliberative, than a simple announcement."); id. at 882 (Easterbrook, J., concurring in part and concurring in the judgment) (contending that the Policy Statement is not entitled to Chevron deference because it is insufficiently formal).
 
 
 C. Application of the Policy Statement
 
 
 43
 In the Policy Statement, HUD reads section 8(b) to prohibit a "settlement service provider" from "mark[ing]-up the cost of another provider's services without providing additional settlement services." Policy Statement, 66 Fed.Reg. at 53,059. Applying HUD's reading of the statute, we conclude that the plaintiffs sufficiently alleged a cause of action when they asserted in their complaint that "[t]hird-party vendors charge Defendants fees to perform ... services. Without performing any additional services, Defendants then charge borrowers a mark-up of these vendors' fees and pocket the difference as profit." Compl. ¶ 24. The grant of the motion for judgment on the pleadings as to the plaintiffs' mark-ups claim was therefore in error.[11]
 
 
 44
 Of course, whether the plaintiffs will be able to establish that the defendants in fact charged fees for services "without performing any additional services" — indeed, precisely what "providing additional settlement services" means in the context of this case — are questions that the district court may be required to address in the first instance on the basis of the factual record that is developed before it.
 
 
 45
 V. Supplemental Jurisdiction over State Law Claims
 
 
 46
 Because, as discussed above, we reverse the district court's dismissal of the plaintiffs' federal claims with respect to mark-ups and remand the case to the district court, we also vacate the judgment of the district court dismissing plaintiffs' state law claims "so that the district court may, in its discretion, exercise supplemental jurisdiction." Valley Disposal, Inc. v. Cent. Vt. Solid Waste Mgmt. Dist., 31 F.3d 89, 103 (2d Cir.1994).
 
 CONCLUSION
 
 47
 For the foregoing reasons, the judgment of the district court is hereby affirmed in part and vacated in part. The case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 48
 Each party shall bear his, her, or its own costs.
 
 
 
 Notes:
 
 
 [1]
 Defendants' corporate disclosure statement, made pursuant to Federal Rule of Appellate Procedure 26.1(a), states, somewhat differently, that Wells Fargo Home Mortgage, Inc., is a subsidiary of Wells Fargo Bank, which is a subsidiary of WFC Holdings Corporation, which is a subsidiary of Wells Fargo & Company. Defendants also state that Wells Fargo Financial Services, Inc., does not currently exist. The parties' differing accounts of defendants' ownership structure are not material to our resolution of the questions presented in this appeal
 
 
 [2]
 [For purposes of RESPA,] the term "settlement services" includes any service provided in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing or settlement
 12 U.S.C. § 2602(3).
 
 
 [3]
 As a preliminary matter, the defendants contend that the plaintiffs' overcharge claim was waived in the district court because it was inconsistent with the mark-up theory they advanced there. We disagree. First, even if the theories are inconsistent, Federal Rule of Civil Procedure 8(e)(2) permits pleading inconsistent theories in the alternative. Second, when the district court asked counsel for the plaintiffs if counsel was withdrawing the plaintiffs' overcharge claim by arguing a "split-fee" theory — the one that defendants assert is inconsistent with the mark-up theory — he responded that he was not. And the complaint clearly alleges both
 
 
 [4]
 According to the Policy Statement:
 A single service provider ... may be liable under Section 8(b) when it charges a fee that exceeds the reasonable value of goods, facilities, or services provided. HUD's regulations as noted state: "If the payment of a thing of value bears no relationship to the goods or services provided, then the excess is not for services or goods actually performed or provided."
 Policy Statement, 66 Fed.Reg. at 53,059 (emphasis added) (quoting 24 C.F.R. § 3500.14(g)(2)).
 
 
 [5]
 "[S]tep two ofChevron requires us to inquire if the [agency's] regulation harmonizes with the language, origins, and purposes of the statute. Consideration of legislative history is generally accepted at this stage of the analysis." Coke, 376 F.3d at 128 (citation and internal quotation marks omitted).
 
 
 [6]
 We note that RESPA contains disclosure requirements applicable to all transactions governed by the statute. 12 U.S.C. § 2603;see also 24 C.F.R. § 3500.8 (specifying, pursuant to § 2603, HUD forms that "shall be used for every RESPA-covered transaction"). The plaintiffs do not allege that the defendants violated any such disclosure obligations.
 
 
 [7]
 The Eleventh Circuit's interpretation in this regard is largely consistent with HUD's view as follows contained in the Policy Statement:
 A settlement service provider may not levy an additional charge upon a borrower for another settlement service provider's services without providing additional services that are bona fide and justify the increased charge. Accordingly, a settlement service provider may not mark-up the cost of another provider's services without providing additional settlement services; such payment must be for services that are actual, necessary and distinct services provided to justify the charge. 24 CFR 3500.14(g)(3). The HUD regulation implementing Section 8(b) states: "[a] charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this Section." 24 CFR 3500.14(c).
 Policy Statement, 66 Fed.Reg. at 53,059 (emphasis added; alteration in original; footnote omitted).
 
 
 [8]
 We have at times simply avoided the question of whether an agency's interpretation is entitledChevron or some lesser degree of deference. See, e.g., Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir.2002) (according agency interpretation "considerable deference, whether under Chevron or otherwise"). And "[e]ven if we are not required to defer to a permissible agency interpretation, we still may defer." Id. (emphasis in original).
 
 
 [9]
 HUD has explained that "[a]ny ... document that is published in the Federal Register by the Secretary and states that it is an `interpretation,' `interpretive rule,' `commentary,' or a `statement of policy' for purpose of [12 U.S.C. § 2617(a)]" constitutes "a rule, regulation or interpretation of the Secretary." 24 C.F.R. § 3500.4(a)(1)(ii) (emphasis added).
 HUD explicitly distinguished such documents from a wide variety of others that, according to HUD, are not promulgated pursuant to the Secretary's authority under 12 U.S.C. § 2617(a), including:
 the special information booklet prescribed by the Secretary or any other statement or issuance, whether oral or written, by an officer or representative of the Department of Housing and Urban Development (HUD), letter or memorandum by the Secretary, General Counsel, any Assistant Secretary or other officer or employee of HUD, preamble to a regulation or other issuance of HUD, Public Guidance Document, report to Congress, pleading, affidavit or other document in litigation, pamphlet, handbook, guide, telegraphic communication, explanation, instructions to forms, speech or other material of any nature which is not specifically included in paragraph (a)(1) of this section.
 
 
 [24]
 C.F.R. § 3500.4(a)(2). That HUD has defined a subset of its documents which are promulgated pursuant to 12 U.S.C. § 2617(a) and that the Policy Statement is within that subset provide further evidence that HUD intended the Policy Statement as an exercise of the interpretive authority delegated to it by Congress
 
 
 [10]
 Before it was amended [in 1992], Regulation X read: No person shall give and no person shall accept any portion, split, or percentage of any [charge] made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. 24 C.F.R. 3500.14(b) (1992)
 Echevarria, 256 F.3d at 627 n. 1; see also 41 Fed.Reg. at 22,707 (restating section 8(b) without making clear that it did, or did not, apply to mark-ups).
 
 
 [11]
 InSosa, the Eleventh Circuit dismissed a complaint, noting that in that case, unlike this one, the plaintiffs' "complaint fail[ed] to allege that Chase did not perform any services." 348 F.3d at 983. It went on to conclude on the facts before it that the plaintiffs "could [not] credibly make such an allegation." Id. We have insufficient basis to decide here whether the plaintiffs' factual allegations are or are not credible, and therefore decline to offer a view on the Eleventh Circuit's conclusion in this regard in Sosa.