[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-13820

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 20, 2008
THOMAS K. KAHN
CLERK

D.C. Docket No. 03-20930-CV-JLK

EDWARD FRIEDMAN
LORI FRIEDMAN,

Plaintiffs-Appellees,

versus

MARKET STREET MORTGAGE CORPORATION,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 20, 2008)**

Before TJOFLAT, FAY and SILER[*], Circuit Judges.

TJOFLAT, Circuit Judge:

---

[*] Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

In this appeal, Market Street Mortgage Corporation ("Market Street") contends that the district court erred in certifying a class of persons represented by Edward and Lori Friedman, in which the stated common question of law is whether Market Street violated subsection 8(b) of the Real Estate Settlement Procedures Act of 1974 ("RESPA"), codified at 12 U.S.C. § 2607(b), by requiring loan borrowers to pay an escrow waiver fee for which Market Street had performed no services. Because we find that this class certification order violated the law of the case and because we also hold that subsection 8(b) does not apply to settlement fees that are alleged to be excessive, we reverse the district court's certification order and remand the case with instructions to dismiss the Friedmans' complaint with prejudice.

The facts and procedural history are presented in Part I of this opinion. Part II discusses the application of the mandate to the Friedmans' case. Part III reads the plain language of subsection 8(b) and holds that it is not a price control provision intended to police the reasonableness of settlement fees. Part IV concludes.

## I.

### A.

Edward and Lori Friedman refinanced their home mortgage on September 5,

2002 with a loan amount of $222,500. According to the standard mortgage contract of the lender, Market Street, a borrower is required to make monthly payments into escrow for items such as taxes, insurance premiums, and "other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property." The escrow payments therefore protect the lender's interest in the property securing the loan.

The majority of loans originated by Market Street are escrowed loans. However, certain borrowers may prefer a different arrangement. At their sole option, borrowers can obtain a waiver of the escrow requirement by paying a one-time escrow waiver fee and assuming the primary responsibility to make payments for taxes and insurance premiums directly.[1] The benefit to borrowers who choose a non-escrowed loan is that the borrowers retain control over the monies that would otherwise be paid into escrow until such time as they make the payments directly.

The Friedmans requested and received a non-escrowed loan, for which they signed a standardized Escrow Waiver Agreement. Pursuant to that agreement, the

---

[1] Not all borrowers of non-escrowed loans are charged an escrow waiver fee, as the cost might be reflected in the interest rate. Of those who are charged an escrow waiver fee, some are not required to pay the fee, as the loan officer may choose to absorb the cost himself by taking a reduced commission.

Friedmans agreed to make timely payments to the appropriate tax and insurance entities and to provide copies of the receipts to Market Street as evidence that the payments were made. As was disclosed on the HUD-1 Settlement Statement signed by the Friedmans at the time of closing, the Friedmans were charged an escrow waiver fee of a quarter of one percent of the total loan amount, or $556.25.

Consistent with common industry practice, Market Street subsequently sold the Friedmans' mortgage loan on the secondary mortgage market to Washington Mutual Bank. On October 3, 2002, Market Street notified the Friedmans that the transfer of the loan's servicing rights to Washington Mutual would be effective on November 1, 2002.

B.

On April 16, 2003, the Friedmans filed suit against Market Street in the United States District Court for the Southern District of Florida, alleging that no services were performed by Market Street in exchange for the escrow waiver fee in violation of subsection 8(b) of RESPA. That section reads, in pertinent part:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

Market Street moved to dismiss the action under Federal Rule of Civil Procedure

12(b)(6), arguing that the Friedmans did not state a claim under subsection 8(b) because they did not allege that the escrow waiver fee was shared or split with a third party. On June 9, 2003, the Friedmans filed a motion for class certification on behalf of "[a]ll persons who after April 16, 2002 were charged an Escrow Waiver Fee by Market Street Mortgage Corporation and thereafter Market Street Mortgage Corporation did not provide escrow services."[2] Consistent with the holdings of the Fourth, Seventh, and Eighth Circuits,[3] the district court agreed that the plain language of the statute requires that a subsection 8(b) claim must contain an allegation that the defendant has shared or split an unearned settlement fee with a third party, and granted Market Street's motion to dismiss the Friedmans' complaint on July 1, 2003.

Our subsequent decision in Sosa v. Chase Manhattan Mortgage Corporation contained language that a single party can be held to violate subsection 8(b) by marking up the charge of another settlement service provider, because "[g]iving a portion of a charge is prohibited regardless of whether there is a culpable acceptor, and accepting a portion of a charge is prohibited regardless of whether there is a

---

[2] This definition of the relevant class of persons reflects the one-year statute of limitations applicable to the action under subsection 8(b). See 12 U.S.C. § 2614.

[3] See Haug v. Bank of America, N.A., 317 F.3d 832, 836 (8th Cir. 2003); Boulware v. Crossland Mortgage Corp., 291 F.3d 261, 265 (4th Cir. 2002); Echevarria v. Chicago Title & Trust Co., 256 F.3d 623, 627 (7th Cir. 2001).

culpable giver." Sosa, 348 F.3d 979, 982–83 (11th Cir. 2003). On August 20, 2003, the Friedmans appealed the district court's judgment dismissing their complaint, arguing that Sosa required reversal of the district court's decision.

In a May 26, 2004 unpublished decision, a panel of this court declined to decide whether the language in Sosa is controlling or is dicta, and affirmed the district court's judgment because "the only allegation in the Friedmans' complaint is that Market Street rendered no services in exchange for the fee, and it is clear from the pleadings that some services were contemplated in exchange for the fee, such as monitoring the payment of taxes and insurance." Friedman v. Market Street Mortgage Corp. (Friedman I), No. 03-14370, slip op. at 3 (11th Cir. 2004).

In its opinion, the Friedman I panel expressly declined to entertain an argument that the Friedmans had not presented to the district court in their complaint, namely, that subsection 8(b) prohibits the charging of fees that are excessive in relation to services actually performed. However, the panel apparently felt that the Friedmans ought to have an opportunity to present an excessive-fee claim to the district court because its mandate included a proviso that the Friedmans be given "a limited opportunity to amend their complaint so as to allege that Market Street charged an excessive fee in exchange for the services

6

contemplated." Id. at 3–4.[4]

The Friedmans filed an amended complaint on June 17, 2004, which re-alleged that Market Street rendered no services in exchange for the escrow waiver fee, and also alleged, in accordance with the Friedman I mandate, that the escrow waiver fee was excessive in relation to services performed. Then, on March 31, 2005, they filed a second motion for class certification, requesting the certification of "[a]ll persons who after April 16, 2002 were charged an escrow waiver fee by Market Street Mortgage Corporation." In a memorandum in support of the motion, the Friedmans argued that no individualized analysis of the value of the services (and thus the reasonableness of the fee charged) was required because their amended complaint alleged that "no services whatsoever" were rendered by Market Street.

On June 8, 2005, the district court certified a class of "[a]ll persons who after April 16, 2002 were charged an escrow waiver fee by Market Street

---

[4] Under the law of this circuit established since Friedman I, the panel would not have remanded the case to district court so that the Friedmans could amend their complaint. After the dismissal of a complaint and the entry of final judgment for the defendant, Federal Rule of Civil Procedure 15(a) does not apply; the plaintiff who seeks leave to amend must do so within 10 days of the entry of judgment by seeking relief under Rule 59(e) (motion to alter or amend a judgment) or Rule 60(b)(6) (motion for relief from a judgment). United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1361 & n.22 (11th Cir. 2006). A plaintiff's obligation is to ask the district court for leave to amend at that time, rather than to ask this court for leave to amend in the event it affirms the district court's Rule 12(b)(6) dismissal.

Mortgage Corporation and whose mortgage loan was sold by Market Street

Mortgage Corporation within (1) one year from the date of the closing of said

loan." The court found that "[t]he overriding common question of law is whether

Market Street Mortgage Corporation violated RESPA by charging an escrow

waiver fee under such circumstances where no service was rendered by the

defendant." (emphasis added). This order is now before us pursuant to the grant of

Market Street's petition for review under Federal Rule of Civil Procedure 23(f).

## II.

The Friedmans' primary argument on appeal is that nothing in the Friedman

I opinion precluded them from re-pleading the claim that no services were

performed by Market Street in exchange for the escrow waiver fee. Indeed, the

Friedmans go even further by arguing that in Friedman I, "this Honorable Court

allowed Plaintiffs the opportunity to replead and to conduct discovery to

determine whether, in fact, Market Street actually performed post closing services

in monitoring that the homeowner's taxes and insurance premium was paid, year

after year."

We are deeply troubled by this argument. The mandate in this case was

clear and specific. We held, without equivocation, that some services were

rendered in this case: "[T]he only allegation in the Friedmans' complaint is that

Market Street rendered no services in exchange for the fee, and it is clear from the pleadings that some services were contemplated in exchange for the fee, such as monitoring the payment of taxes and insurance." The question of whether services were rendered in this case was settled. If the Friedmans thought it was not settled, they could have moved for clarification of the mandate, or for rehearing. They did neither. Instead, the Friedmans simply obtained the district court's leave to amend their complaint so as to allege that the escrow waiver fee was excessive in relation to services performed by Market Street.

On limited remand for the specific purpose of giving the Friedmans the opportunity to allege that the escrow waiver fee was excessive, the Friedmans effectively urged the district court to disregard the clear instructions set forth in the mandate – by revisiting the question of whether no services were rendered in exchange for the escrow waiver fee – in contravention of the mandate rule. The mandate rule is "a specific application of the 'law of the case' doctrine" which provides that subsequent courts are "bound by any findings of fact or conclusions of law made by the court of appeals in a prior appeal of the same case." Robinson v. Parrish, 720 F.2d 1548, 1549–50 (11th Cir. 1983) (citation omitted); Piambino v. Bailey, 757 F.2d 1112, 1120 (11th Cir. 1985). The law of the case doctrine and the mandate rule "appl[y] to all issues decided expressly or by necessary

9

implication." Piambino, 757 F.2d at 1120. "A trial court, upon receiving the mandate of an appellate court, may not alter, amend, or examine the mandate, or give any further relief or review, but must enter an order in strict compliance with the mandate." Id. at 1119. Contrary to the Friedmans' contention, the Friedman I panel in no wise directed the district court to reexamine whether Market Street rendered no services in exchange for the escrow waiver fee, nor did the panel postpone the resolution of that issue pending further discovery on remand. Friedman I established the law of this case that some services had been rendered. Again, the Friedmans did not file a motion for clarification of the mandate or for rehearing; as such, the district court was not free to ignore the mandate and reexamine the issue. See Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1516 (11th Cir. 1987).

The Friedmans cite Odaleinde v. Birmingham, 230 F.3d 1275 (11th Cir. 2000), in support of the proposition that a plaintiff may return to district court and re-plead a claim, notwithstanding the fact that a court of appeals has affirmed the dismissal of the claim on the merits. That case is wholly inapposite. In Odaleinde, which involved a 42 U.S.C. § 1983 civil rights action against police officers, we affirmed the district court's order denying qualified immunity for the police officers because of the limited nature of the record at the motion to dismiss

stage.  Odaleinde, 230 F.3d at 1285.  But that affirmance did not establish the law of the case.  We explained: "We stress, however, that defendants retain the right to assert the qualified-immunity defense at the next stage of the proceedings (and, for that matter, throughout the proceedings) as more facts are developed."  Id.  The fact that we expressly permitted the defendants to re-assert the qualified immunity defense as the facts developed in Odaleinde does not even remotely approach the proposition that a district court may revisit an issue already decided by an appellate court.

We now consider whether the district court was otherwise justified by exceptional circumstances in deviating from the law of the case established in Friedman I.  Only three such exceptions are recognized: where "the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice."  United States v. Escobar-Urrego, 110 F.3d 1556, 1561 (11th Cir. 1997) (quoting White v. Murtha, 377 F.2d 428, 431–32 (5th Cir. 1967)).[5]

There has been no intervening change in controlling authority, and the

_____

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Friedmans make no such claim. Rather, the Friedmans contend that this case falls under the remaining two exceptions. We disagree.

As to the first exception, we are not persuaded that the new evidence proffered by the Friedmans is substantially different so as to warrant a departure from the doctrine of the law of the case. The Friedmans contend that discovery has established: "(a) that Market Street charges a separate $70 fee for a third party tax monitoring service and, therefore, no part of the $556.25 fee is charged for that service, and (b) that Market Street performed no post-closing insurance premium payment monitoring services for the Friedmans, or any of the other class members, because it sold their loans on the secondary market before any such payments were due." Such evidence, however, is not substantially different; it is of a piece with what was contemplated by the allegations in the complaint before the Friedman I panel. The Friedman I panel had before it the Friedmans' mortgage loan documents, including the single-page Escrow Waiver Agreement.[6] The fact that the Friedmans were charged a separate $70 fee for third party tax monitoring services was then apparent, because item 807 of the HUD-1 Settlement Statement

---

[6] The mortgage loan documents were attached to the complaint and were thus properly considered as part of the complaint. See Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000). On appeal, Market Street was permitted to supplement the record to include the Escrow Waiver Agreement. "Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control." Tucker v. Nat'l Linen Serv. Corp., 200 F.2d 858, 864 (5th Cir. 1953).

12

listed the escrow waiver fee of $556.25 separately from item 811, the tax service fee of $70. The Friedman's initial complaint also alleged that the Friedmans' mortgage was resold in the secondary market soon after closing, and that the class action was brought on behalf of borrowers for whom Market Street "provided no escrow services and, in fact, sold or transferred the loan." All of this was before the Friedman I panel, and the panel duly concluded that "it is clear from the pleadings that some services were contemplated in exchange for the fee, such as monitoring the payment of taxes and insurance."

As for the Friedmans' invocation of the third exception to the law of the case doctrine, we are not convinced that the panel's decision in Friedman I was clearly erroneous and would work a manifest injustice. The Friedmans' assertion of clear error and manifest injustice is essentially a restatement of their claim that the discovery of new evidence requires a departure from the law of the case, a contention that we have already rejected. Moreover, further discovery on remand does not indicate clear error in this case. Steven Chiou, Market Street's corporate representative, testified during his deposition that the $70 charged as a tax service fee is used to pay a third party contractor to perform tax monitoring services. It does not necessarily follow, however, that no portion of the $556.25 escrow waiver fee is charged for services related to tax service monitoring. In Sosa, the

13

defendant, Chase Manhattan Mortgage Corporation ("Chase"), outsourced the task

of providing messenger or courier services in connection with loan closing. Sosa,

348 F.3d at 984. Chase charged borrowers a $50 fee for messenger or courier

services, but paid only part of the fee to the third party contractor. Id. at 983. We

held that even if Chase "could not be credited with the actual delivery, Chase

benefitted the borrowers by arranging for third party contractors to perform the

deliveries. Under these circumstances, we find it impossible to say that Chase

performed no services for which its retention of a portion of the fees at issue was

justified." Id. at 984. Similarly, Market Street performs the service of locating

and arranging for a third party contractor to perform tax monitoring services.

Chiou also testified that certain services are rendered on all non-escrowed

loans, regardless of whether they are subsequently resold within one year of their

origination. Such services include:

> (1) setting up the servicing system for those loans prior to their
> transfer; (2) capturing and entering the current tax and hazard
> insurance information; (3) making arrangements for and payments to
> a tax service company in connection with the servicing of that loan;
> and (4) following up with the new investor/servicer for the first
> several months to ensure that the tax and insurance information was
> correctly transferred, and to resolve any problems that might arise
> with regard to the loan servicing.[7]

---

[7] Chiou also testified that the escrow waiver fee is charged because non-escrowed loans
pose a greater risk of loss to the note holder and servicer because, among other things, the lender

14

The Friedmans do not contend that these services are not performed, but rather attempt to downplay the value of such services by arguing that "Market Street has the temerity to suggest that it performs a service by merely opening up its file."

In sum, none of the exceptions to the law of the case doctrine apply in this case.

### III.

The Friedman I opinion expressly declined to decide whether a settlement service provider is liable under subsection 8(b) of RESPA for charging a fee that is excessive in relation to services or goods actually rendered. We now take up that issue. As with the Second, Third, Fourth, Seventh, and Eighth Circuits, we hold that subsection 8(b) does not govern excessive fees because it is not a price control provision.[8]

The Friedmans contend that the Statement of Policy ("SOP") issued by the Department of Housing and Urban Development ("HUD") in 2001 is entitled to

---

relinquishes control over the payment of tax and insurance premiums; non-escrowed loans are therefore less valuable on the secondary mortgage market. He further testified that Market Street does not profit on such fees because they are equal to or less than the amount to which non-escrowed loans are discounted by subsequent purchasers.

[8] See Santiago v. GMAC Mortgage Group, Inc., 417 F.3d 384, 387 (3d Cir. 2005); Kruse v. Wells Fargo Home Mortgage, Inc., 383 F.3d 49, 56–57 (2d Cir. 2004); Haug v. Bank of America, N.A., 317 F.3d 832, 836 (8th Cir. 2003); Krzalic v. Republic Title Co., 314 F.3d 875, 880–81 (7th Cir. 2002); Boulware v. Crossland Mortgage Corp., 291 F.3d 261, 267 (4th Cir. 2002).

<u>Chevron</u> deference, such that we must defer to the interpretation contained in the SOP unless it is "arbitrary, capricious, or manifestly contrary to the statute." <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984). The SOP concludes that a settlement service provider may be liable under subsection 8(b) and its implementing regulation "when it charges a fee that <u>exceeds the reasonable value</u> of goods, facilities, or services provided." Real Estate Settlement Procedures Act Statement of Policy 2001-1, 66 Fed. Reg. 53,052, 53,059 (Oct. 18, 2001) (emphasis added). Market Street counters that subsection 8(b) cannot reasonably be read to prohibit excessive fees, and that the SOP is therefore not entitled to deference.

We begin, of course, with the plain language of the statute. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842–43, 104 S. Ct. at 2781; <u>Heimmerman v. First Union Mortgage Corp.</u>, 305 F.3d 1257, 1261 (11th Cir. 2002) ("No deference is to be given to an agency interpretation that is at odds with the plain meaning of the statute being interpreted."). To reiterate, subsection 8(b) provides that:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a

16

federally related mortgage loan other than for services actually performed.

Consistent with the holdings of our sister circuits, we find that the language of subsection 8(b) precludes the interpretation urged by the Friedmans. Subsection 8(b) prohibits the charging of fees "other than for services actually performed." As explained by the Second Circuit: "[N]othing in the language authorizes courts to divide a 'charge' into what they or some other person or entity deems to be its 'reasonable' and 'unreasonable' components. Whatever its size, such a fee is 'for' the services rendered by the institution and received by the borrower." Kruse v. Wells Fargo Home Mortgage, Inc., 383 F.3d 49, 56 (2d Cir. 2004). Because the language is clear and unambiguous, "[t]here is not enough play in the statutory joints to allow HUD to impose its own 'interpretation' under the aegis of Chevron." Krzalic v. Republic Title Co., 314 F.3d 875, 881 (7th Cir. 2002).

We note further that the plain reading of subsection 8(b) is in harmony with the overall statutory scheme. Nowhere else does the statute define a "reasonable" or "unreasonable" charge. Yet subsection 8(d)(2) permits the award of treble damages; it would "be an odd reading of the statute to conclude that it instructs federal courts to award treble damages for 'unreasonable' charges made by financial institutions without giving those courts so much as a hint as to how to

17

differentiate between what is and is not 'reasonable.'" Kruse, 383 F.3d at 56

(citation omitted).  This view of section 8 as a means of targeting abusive

practices, not as a means of setting broad-ranging price controls, is also consistent

with the legislative history of RESPA.  In 1973, Senator Proxmire introduced S.

2288, a bill that would have

> empowered [HUD] to "establish the maximum amounts of the
> charges to be imposed upon the borrower and seller for services
> incident to or a part of a real estate settlement . . . which shall be
> designed to reflect the reasonable charges for necessary services . . .
> and to assure that settlement costs do not exceed such reasonable
> charges . . . ."

See id. at 56–57 (citation omitted).  The Proxmire bill was rejected.  As described

in the legislative history of what ultimately became section 8(b):

> [T]here are two basic approaches that can be taken in solving the
> problem of settlement costs.  One approach is to regulate closing
> costs directly, that is to provide for legal maxima on the charges
> which may be imposed for services incident to real estate settlements.
> This approach is the one taken in S. 2288.  The second approach is to
> regulate the underlying business relationships and procedures of
> which the costs are a function.  This is the approach employed in S.
> 3164 adopted by the Committee.

S. Rep. No. 93-866 (1974), reprinted in 1974 U.S.C.C.A.N. 6546, 6548.  Cf.

Boulware v. Crossland Mortgage Corp., 291 F.3d 261, 268 (4th Cir. 2002)

("RESPA was meant to address certain practices, not enact broad price

controls.").[9]

Our holding in Heimmerman v. First Union Mortgage Corporation does not compel our deference to the SOP with respect to the issue in this case. In Heimmerman, we found that the plain language of RESPA does not "speak to the standard for determining whether the payment of a [yield spread premium] violates the Act," because subsection 8(a) refers only to kickbacks and referral fees. Heimmerman, 305 F.3d at 1261.[10] We ultimately found it proper to defer to the SOP's interpretation of "how to determine when a YSP is an illegal kickback and when it is a legally permissible payment for services actually performed." Id. at 1261, 1263–64. Heimmerman did not hold that we must grant Chevron deference to all HUD interpretations of RESPA, nor did Heimmerman speak to the issue of excessive fees or subsection 8(b). Cf. Krzalic, 314 F.3d at 881–82 (distinguishing the issue of overcharges from that of yield-spread premiums in Heimmerman and

[9] In addition, as Judge Posner indicates, in order to be entitled to deference, the SOP must have been accompanied by "something more formal, more deliberate, than a simple announcement," some nod to public process, even if it does not amount to formal adjudicative procedures. See Krzalic, 314 F.3d at 881. Such was not the case with the 2001 SOP: "One fine day the policy statement simply appeared in the Federal Register." Id.

[10] A yield spread premium "is a payment made by a lender to a broker in exchange for that broker's delivering a mortgage that is above the 'par rate' being offered by the lender. Briefly stated, the payment is typically a certain percentage of the total amount of the loan; the exact percentage is determined by the extent to which the actual interest rate exceeds the par rate." Heimmerman v. First Union Mortgage Corp., 305 F.3d 1257, 1259 (11th Cir. 2002).

other cases).[11]

## IV.

Because <u>Friedman I</u> established the law of the case, without exception, and because we hold today that subsection 8(b) requires a plaintiff to allege that no services were rendered in exchange for a settlement fee, the Friedmans could not amend their complaint in any fashion that could state a cause of action under subsection 8(b). The district court's grant of class certification is hereby VACATED, and the case is REMANDED to the district court with instructions to dismiss the Friedmans' complaint with prejudice.

SO ORDERED.

---

[11] Because we dispose of Market Street's appeal for the reasons described in parts II and III, <u>supra</u>, we have no occasion to address the other issues in this case presented for review, including whether the district court abused its discretion by: (1) determining that class treatment is appropriate because common questions of law or fact predominate; (2) certifying a class in which the named plaintiffs purportedly have personal and financial ties with class counsel; and (3) concluding that the Rule 23(a) requirements for class certification are met.