# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-2285

NEDZAD KRZALIC and DANIJELA KRZALIC,

*Plaintiffs-Appellants,*

v.

REPUBLIC TITLE CO.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 9979—**Charles P. Kocoras**, *Chief Judge.*

ARGUED NOVEMBER 1, 2002—DECIDED DECEMBER 26, 2002

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

POSNER, *Circuit Judge.* Section 8(b) of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607(b), provides that "no person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." The plaintiffs in this class action suit contend that the defendant, the closing agent in their purchase of a home, charged them $50 for recording their mortgage yet paid the county recorder only $36. The plaintiffs (who

conceded in the district court, but forgot in this court, that they lack standing to challenge a second alleged over-charge, made by the sellers of the house for the release of the previous mortgage) claim that the $14 difference pocketed by the defendant represented the receipt of a portion of a charge other than for a service actually per-formed, and so violated the statutory provision that we quoted.

In *Echevarria v. Chicago Title & Trust Co.*, 256 F.3d 623, 626-28 (7th Cir. 2001), we held, as have other courts, see *Boulware v. Crossland Mortgage Corp.*, 291 F.3d 261, 265-68 (4th Cir. 2002); *Willis v. Quality Mortgage USA, Inc.*, 5 F. Supp. 2d 1306, 1309 (M.D. Ala. 1998), that section 8(b) is an anti-kickback provision. There was no kickback in that case, and there is none here. But in response to our decision, the Department of Housing and Urban Develop-ment, which Congress has authorized to "prescribe such regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of" the Act, 12 U.S.C. § 2617(a), issued a policy statement in which, clarifying its previous views on the subject, which had been ambiguous, see, e.g., 24 C.F.R. 3500.14(c); 57 Fed. Reg. 49600, 49605 (Nov. 2, 1992); *Echevarria v. Chicago Title & Trust Co., supra*, 256 F.3d at 627-28, it stated its disagree-ment with our decision and made clear its view that sec-tion 8(b) is not "limited to situations where at least two persons split or share an unearned fee." HUD, *Real Estate Settlement Procedures Act Statement of Policy 2001-1*, 66 Fed. Reg. 53052, 53057 (Oct. 18, 2001). Any repricing of charges, the statement contends, is unlawful. The pol-icy statement was not adopted in a notice and com-ment rulemaking proceeding or with any other delibera-tive formalities, and the district judge, refusing on that ground to give the statement *Chevron* deference and

declare *Echevarria* defunct, granted the defendant's motion to dismiss the suit for failure to state a claim. HUD has filed an amicus brief in this court in support of the plaintiffs' appeal.

When a statute administered by a federal agency is unclear and the agency is authorized to interpret it, the agency's interpretation, unless unreasonable, may bind a reviewing court in accordance with *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984). Ordinarily issues of statutory interpretation are treated as pure issues of law, and no deference is given the interpretation adopted by executive or other officials. But *Chevron*, in effect equating statutory interpretation to policymaking (cf. Hans Kelsen, *Pure Theory of Law* 351-353 (Max Knight trans. 1967)), hands over (with certain qualifications) interpretive responsibility to the officials responsible for making policy judgments, when the ordinary interpretive tools used by courts, such as textual interpretation, do not work well.

By taking this position the Court appears to have shifted power from the legislative to the executive branch, and to the so-called "independent" administrative agencies as well, by limiting judicial authority to preserve the deal struck by contending interest groups in the original legislation. For while in principle Congress can step in and curb a straying agency, the practice is often different because of the obstacles to legislating that are built into the federal legislative process, including bicameralism and the Presidential veto. William N. Eskridge, Jr., *Dynamic Statutory Interpretation* 164-67 (1994); Jonathan T. Molot, "Reexamining *Marbury* in the Administrative State: A Structural and Institutional Defense of Judicial Power Over Statutory Interpretation," 96 *Nw. U.L. Rev.* 1239, 1282 (2002); see also William N. Eskridge, Jr. & John Ferejohn,

"The Article I, Section 7 Game," 80 *Geo. L.J.* 523, 538-43 (1992). These obstacles give agencies a degree of running room.

Small-d democrats might question *Chevron*'s shift of legislative power to the bureaucracy. But realists, while acknowledging the point and also that it is a fiction to suppose *Chevron* itself an interpretation of the statutes to which it applies or that the exercise of power by appointed officials is democratic merely because it is authorized by elected officials, will applaud the Supreme Court's recognition that the interpretation of an ambiguous statute is an exercise in policy formulation rather than in reading.

*Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649-50 (1990), might seem to cast doubt on *Chevron*'s applicability to the Real Estate Settlement Procedures Act, however, because the Court said that "Congress has expressly established the Judiciary and not the Department of Labor as the adjudicator of private rights of action arising under the statute [a statute for the protection of farm workers]. A precondition to deference under *Chevron* is a congressional delegation of administrative authority . . . . No such delegation regarding AWPA's enforcement provisions is evident in the statute. Rather, Congress established an enforcement scheme independent of the Executive and provided aggrieved farmworkers with direct recourse to federal court where their rights under the statute are violated." RESPA too is enforced by private actions rather than by judicial or administrative proceedings instituted by HUD. But whereas the farm workers' statute had not delegated to the Department of Labor authority to fill gaps in the statute, RESPA explicitly delegates such authority to the Department of Housing and Urban Development, in 12 U.S.C. § 2617(a), which we quoted earlier. Two

of the three courts to have considered the question have concluded, albeit without discussion of *Adams Fruit*, that at least some HUD interpretations of RESPA are within the scope of *Chevron*. *Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257, 1261-62 (11th Cir. 2002); *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1012 (9th Cir. 2002).

The third court, in *Glover v. Standard Federal Bank*, 283 F.3d 953, 961-63 (8th Cir. 2002), reached a similar result by the old-fashioned route, mapped in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), of granting the degree of deference that an agency's decision invites by virtue of the cogency of its reasoning in relation to the nature of the issue. The more technical the issue is, the less guidance the statute provides to its correct resolution, the more sensible-seeming the agency's decision, and the more deliberative and empirical the procedures employed in arriving at that decision, the greater the deference that a reviewing court will give it.

*Barnhart v. Walton*, 122 S. Ct. 1265, 1272 (2002), the Supreme Court's most recent decision interpreting *Chevron*, suggests a merger between *Chevron* deference and *Skidmore*'s and *Glover*'s approach of varying the deference that agency decisions receive in accordance with the circumstances: "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." Or in the words of Professor Pierce, "legislative rules and formal adjudications are always entitled to *Chevron* deference, while less formal pronouncements like interpretative rules and informal adjudications

may or may not be entitled to *Chevron* deference. The deference due a less formal pronouncement seems to depend on the results of judicial application of an apparently open-ended list of factors that arguably qualify as 'other indication[s] of a comparable congressional intent' to give a particular type of agency pronouncement the force of law." Richard J. Pierce, Jr., *Administrative Law Treatise* § 3.5, pp. 6-7 (4th ed. Supp. 2003).

We need not penetrate more deeply into this thicket; for even if HUD's interpretations of RESPA are entitled to *Chevron* deference, that deference is not total and as it happens section 8(b) of RESPA will not bear, as a matter of straightforward judicial interpretation (for if such interpretation dissipates any possible statutory ambiguity and fills any possible gap in the statute, *Chevron* deference is not owed), the meaning that HUD wants to give it. Republic Title did not "accept any portion, split, or percentage of any charge." No one agreed to divide a receipt with Republic. The statutory language describes a situation in which *A* charges *B* (the borrower) a fee of some sort, collects it, and then either splits it with *C* or gives *C* a portion or percentage (other than 50 percent—the situation that the statutory term "split" most naturally describes) of it. *A* might be a lawyer, and *C* a closing agent like Republic Title, and *A* might charge a legal fee to *B* and kick back a share of it to *C* for recommending to the borrower that he use *A*'s services. That would be a form of commercial bribery and is the target of section 8(b). Republic, however, received no part of a fee charged by someone else. The plaintiffs' beef is that the county recorder did *not* charge $50 to record their mortgage; and so he could not have divided it with Republic. Recall, too, that the statute forbids the giving as well as the receiving of any portion, split, or percentage. On the plaintiffs' understanding, they themselves violated the statute because

they gave Republic a portion of the fee charged by the county recorder!

In *United States v. Gannon*, 684 F.2d 433, 435-36 (7th Cir. 1981) (en banc), the strongest case for HUD and the plaintiffs but not strong enough, a county clerk charged more than the stated fee and kept the difference. He was accepting in his personal capacity a portion of the fee that he was imposing in his official capacity. It was as if he had kicked back the difference to Republic.

Usually when a statutory provision is clear on its face the court stops there, in order to preserve language as an effective medium of communication from legislatures to courts. If judges won't defer to clear statutory language, legislators will have difficulty imparting a stable meaning to the statutes they enact. But if the clear language, when read in the context of the statute as a whole or of the commercial or other real-world (as opposed to law-world or word-world) activity that the statute is regulating, points to an unreasonable result, courts do not consider themselves bound by "plain meaning," but have recourse to other interpretive tools in an effort to make sense of the statute. E.g., *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 453-55 (1989); *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring); *AM Int'l, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 577 (7th Cir. 1995); Veronica M. Dougherty, "Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation," 44 *Am. U.L. Rev.* 127 (1994). They do not want to insult the legislature by attributing absurdities to it.

In this case, however, context *reinforces* the implications of the statutory language. On the plaintiffs' and HUD's view, section 8(b) forbids a lender or closing agent to re-price any of the charges that it has incurred and is passing

on to the borrower. This would make sense if RESPA were a public-utility or other rate-regulating statute, but it is not. The statute places no ceiling on the amount that a closing agent can charge for its services. At the closing on the Krzalics' real estate transaction, Republic charged them a closing fee of $315 plus various expenses that included the $50 recording fee. Had Republic charged the Krzalics only the actual recording fee of $36, it could have raised its closing fee to $329 and be in the identical economic position that it was in with the repricing of the fee. The plaintiffs and HUD argue that Republic would have been reluctant to do this because then the plaintiffs might have taken their business to a closing agent that charged a lower closing fee. But all that borrowers care about is the bottom line—which in this case was approximately $165,000—and that would not have been affected by which line contained the $14; the sum of $315 and $50 is identical to the sum of $329 and $36. If borrowers are as price conscious as the Krzalics claim to be (and more power to them), then their lawyers (for the Krzalics were represented by counsel at the closing), who know what the county recorder charges for routine services, will shop for closing agents who neither reprice such charges nor make compensating upward adjustments in their closing fees.

Nothing is more common than for professionals to reprice the incidental charges that they incur on behalf of their clients. Law firms, for example, typically reprice their copying expenses in their bills to their clients. The client is not hurt because he can easily find out what those expenses actually were, and so it is with the government's charges for routine services in connection with real estate transactions—the charges are not secret. If the real estate settlements industry is competitive, a member of the industry cannot increase the market price for

its services by how it allocates its overhead among the different components of its invoices. What is more, if the effect of the plaintiffs' suit were to induce closing agents like Republic to defer levying the charge for recording until it did the recording and thus knew the exact fee, it would be more rather than less difficult for consumers to comparison shop among closing agents.

Maybe, though, there is some hanky-panky going on here that we are missing by assuming away costs of information. When asked at argument why his client reprices the recording fee, Republic's lawyer answered that the precise fee is not known until the documents are recorded, and that occurs after the closing. True, but it's easy enough to estimate within pennies. A visit to the Cook County recorder's Web site reveals that the fee for recording a mortgage is $23 for the first two pages and $2 for each additional page plus 50 cents for service by return mail; so for the eight-page mortgage involved here, the total fee could readily be estimated at $35.50, which is well short of the $50 that Republic charged. And anyway Republic does not refund any overcharge that emerges when the precise fee is learned. Still, to repeat an earlier point, we have difficulty seeing what difference it can make to the consumer where the $14 "overcharge" appears on the closing statement. And if there is a fraud here, there are plenty of legal remedies, though none so far as we know under RESPA.

But the most important point is that if the practice of repricing incidental charges is a fraud or market failure or abuse of some sort, still it is not a market failure that section 8(b) can reasonably be thought to address, and so a reading of the section that leaves the failure uncured is not a reading that creates a loophole. If RESPA were a price-control statute a loophole would be opened if the firms

subject to the statute were allowed to mark up cost items in their bills to whatever height they wanted. It is not a price-control statute.

There is not enough play in the statutory joints to allow HUD to impose its own "interpretation" under the aegis of *Chevron*. But there is a further point. If an agency is to assume the judicial prerogative of statutory interpretation that *Chevron* bestowed upon it, it must use, not necessarily formal adjudicative procedures or its closest nonadjudicative counterpart, which is notice and comment rulemaking (as in *Sierra Club v. EPA*, 311 F.3d 853, 858 (7th Cir. 2002)), but, still, something more formal, more deliberate, than a simple announcement. *See Barnhart v. Walton, supra*, 122 S. Ct. at 1271-72; *United States v. Mead Corp.*, 533 U.S. 218, 229-31 (2001). A simple announcement is too far removed from the process by which courts interpret statutes to earn deference. A simple announcement is all we have here. One fine day the policy statement simply appeared in the Federal Register. No public process preceded it—or at least the part of it that concerns section 8(b), for the policy statement deals with other matters as well.

The qualification is important. In 1999 HUD had issued a policy statement concerning yield-spread premiums (a method of spreading the normal up-front closing costs over the life of the mortgage) after meeting with government representatives plus a broad range of consumer and industry groups. 64 Fed. Reg. 10080, 10084 (Mar. 1, 1999). And both that statement and a portion of the 2001-1 statement (the one on which HUD and the plaintiffs rely here) that further addressed the issue of yield-spread premiums contain a full discussion of that issue. But the discussion in the 2001-1 statement of the unearned-fees (i.e., section 8(b)) issue is perfunctory. It expresses disagreement with our decision in *Echevarria* but gives no reason

except that HUD has always regarded such fees as forbidden by the statute, though previously it had failed to make this clear. No evidence or interpretive methodology is mentioned; no abuse pointed to that might justify the contorted interpretation urged by HUD. Its amicus brief alarmingly warns that repricing is "putting home ownership beyond the reach of many Americans," that "HUD is currently investigating over 100 complaints," and that if we don't adopt its interpretation we will be permitting "unscrupulous providers to inflate settlement charges without limit." None of this appears in the policy statement, perhaps because it is silly; a $14 overcharge (if that is how it should be viewed) in a $165,000 purchase is not going to make the difference between owning and renting. It is no surprise that *Heimmermann*, *Schuetz*, and *Glover*, the three decisions we cited earlier that defer to HUD interpretations, all dealt with the part of the 2000-1 statement that concerns yield-spread premiums.

AFFIRMED.

EASTERBROOK, *Circuit Judge*, concurring in part and concurring in the judgment. I join my colleagues' opinion except for those portions that discuss *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Real Estate Settlement Practices Act is enforced entirely through private litigation, and *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649-50 (1990), holds that, when this is true, the view of a federal agency achieves binding force only when incorporated into legislative regulations

issued under delegated power. The Department of Housing and Urban Development has the power to prescribe regulations, see 12 U.S.C. §2617(a), but elected instead to announce its interpretation of the statute. It issued a broadside and hoped that courts would kowtow. Yet in private litigation *Chevron* does not give any force to a declaration unaccompanied by the formalities of rulemaking or administrative adjudication. See also *United States v. Mead Corp.*, 533 U.S. 218 (2001). Otherwise the Administrative Procedure Act, which specifies how delegated power is to be exercised, would be a dead letter. When an agency doles out public funds and is a party to the suit, less formal steps may have legal effects, see *Barnhart v. Walton*, 535 U.S. 212 (2002), but ours is not such a situation. If the agency abjures the APA's procedures for making decisions, courts owe the administrative interpretation careful attention, see *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), but nothing more. "Interpretations contained in policy statements . . . which lack the force of law do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); see also *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 256-58 (1991). I do not perceive in *Walton* any "merger" (slip op. 5) between *Chevron* and *Skidmore*, which *Mead* took such pains to distinguish. HUD's interpretation is on the *Skidmore* side of the line.

Surprisingly, two circuits have treated HUD's *Real Estate Settlement Procedures Act Statement of Policy 2001-1*, 66 Fed. Reg. 53052 (Oct. 18, 2001), as equivalent to a regulation. See *Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257, 1261 (11th Cir. 2002); *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1012 (9th Cir. 2002). Yet neither opinion discusses the significance of *Adams Fruit* or *Christensen* in relation to the agency's disregard of those procedures that the APA establishes for the exercise of reg-

ulatory authority. *Heimmermann, Schuetz*, and a related decision, *Glover v. Standard Federal Bank*, 283 F.3d 953, 963-65 (8th Cir. 2002), concern the treatment of yield-spread premiums under the RESPA, and I have nothing to say about the legal status of that practice. As *Glover* observes, HUD has issued regulations about yield-spread premiums, and the policy statement may be understood as an interpretation of those regulations, which do have binding status. But I am confident that *Heimmermann* and *Schuetz* erred in thinking that the *Real Estate Settlement Procedures Act Statement of Policy 2001-1* is itself conclusive under *Chevron*, as opposed to informative (and potentially persuasive).

*Boulware v. Crossland Mortgage Corp.*, 291 F.3d 261 (4th Cir. 2002), holds, and all members of this panel agree, that HUD's interpretation of §8(b), 12 U.S.C. §2607(b), finds no purchase in the statutory text, is essentially unreasoned, and is neither informative nor persuasive. Section 8 is an anti-*kickback* rule, not an anti-*markup* rule. It does not forbid profit and could not do so, given the closing agent's unfettered ability to set a price for the package of services it offers. See *Mercado v. Calumet Federal Savings & Loan Ass'n*, 763 F.2d 269 (7th Cir. 1985). It would make neither linguistic nor economic sense to describe the difference between wholesale and retail price in the auto business as a "portion, split, or percentage of any charge" because the dealer must pay the manufacturer for inventory. Just so in real estate closings: The Recorder of Deeds' fee is Republic Title's wholesale price for a service; Republic's retail price is higher. Republic bears the costs of transferring the deed to the Recorder; it must pay the salary of employees who process the papers, and maybe it pays a messenger service too. The markup covers these and other costs, such as the bank's fees on the checks written to the Recorder, the cost of capital used to

run the business, and the risk that some deeds may be so lengthy that the Recorder's fees will top the charge. Whether or not the $50 exceeds all costs associated with getting the deed filed, nothing has been "split" or kicked back. Services were furnished as described: the deed was filed, and the closing agent performed (and bore the cost of) all the ministerial acts essential to accomplish filing. By announcing that the RESPA forbids markups over wholesale price, HUD has gone off on a tangent. It might as well have said that the salary paid to the closing agent's staff, or the rent paid to the landlord for space used in the closing, is an illegal "split" of funds received from the customer.

All of this makes *Chevron* by the by, so it is surprising that my colleagues go out of their way to suggest that its approach is undemocratic and that statutory interpretation is just policymaking by another name. In what sense could it be "undemocratic" to have statutory ambiguities resolved, and gaps filled, by elected officials (and those who serve at their pleasure) rather than by judges whose tenure insulates them from the popular will? What is more, textualists are among *Chevron*'s supporters, an odd position if the decision adopts the view that legal texts are empty vessels to be filled by judges (or administrators). All *Chevron* does is acknowledge that decisionmaking authority is shared among branches of government; it does not imply that the only sensible interpretive stance is pragmatic rather than textualist. Nor does *Chevron* surreptitiously transfer authority from the legislative to the executive branch of government. Agencies' interpretive role stems from delegation of authority, not raw ambiguity. That's one reason why *Chevron* does not require courts to implement "interpretations" that agencies announce without following the APA's requirements for

rulemaking: following forms is a condition attached to the delegation.

Interpretation differs fundamentally from regulation. Judges do not apply *Chevron* to the Attorney General's interpretation of the Sherman Antitrust Act, whether in public or in private litigation, although the antitrust statutes are notoriously open-ended. Nor do courts accept under *Chevron* the prosecutor's interpretation of ambiguous criminal statutes such as RICO. *Chevron* itself says that delegation is the key; *Adams Fruit* and *Mead* drive the point home. When the holder of a delegated power wields that authority, the legislative plan has been fulfilled, not frustrated. Congress can choose to delegate, or not, statute-by-statute or through framework laws such as the APA; it could undo *Chevron* across the board if the doctrine functioned as kryptonite to its enactments. All that matters today, however, is that when the executive branch does not employ regulatory power delegated by the legislative branch, resolution of ambiguities in private litigation belongs to the judicial branch.

A true Copy:

      Teste:

                              _____
                              *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*