Juan A. **RIVERA, Plaintiff,**

v.

**Robert S. MUELLER, Director of the Federal Bureau of Investigation, Defendant.**

No. 08 C 6185.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 2, 2009.

Thomas P. Sullivan, Andrew William Vail, Jenner & Block LLP, Jeffrey Urdangen, Bluhm Legal Clinic, Northwestern School of Law, Chicago, IL, for Plaintiff.

Elisabeth Layton, U.S. Department of Justice, Federal Programs Branch, Washington, DC, for Defendant.

### *ORDER*

REBECCA R. PALLMEYER, District Judge.

Plaintiff Juan Rivera has been tried twice and convicted of the murder of eleven-year-old Holly Staker, who was raped and murdered in Waukegan in 1992. Mr. Rivera, who has been sentenced to natural life, has consistently maintained his innocence of this crime. In 2005, Mr. Rivera's attorneys presented DNA evidence showing that the semen recovered from the victim's vagina had not been deposited by Mr. Rivera. The presiding judge in Lake County, Illinois granted his motion for a new trial. That trial is scheduled to begin on February 9, 2009.

In an effort to establish that another individual is guilty of the crime for which he has twice been convicted, Mr. Rivera seeks an FBI comparison of the DNA recovered from the semen found in Holly Staker against the FBI's nationwide databank of DNA samples. The parties refer to such a comparison as a "manual keyboard search." The Lake County State's Attorney has joined Mr. Rivera's request

for such a search, and the state court judge who will preside over his trial has issued an order directing that the search be performed. The FBI nevertheless refuses to proceed with the keyboard search. In an August 8, 2008 letter to Rivera's attorneys, D. Christian Hassell, the Director of the FBI laboratory, articulated two reasons for the refusal: First, the FBI will honor a request for a keyboard search only if it is submitted "through the appropriate Combined DNA Index System (CODIS) State Administrator," not one made by Mr. Rivera's private lawyers. Second, the FBI asserts that its index must be limited to information on DNA analyses that have been prepared by accredited laboratories; the DNA profile submitted by Mr. Rivera was developed in a laboratory which has not been accredited and does not submit itself to external audits that assess quality.

In this action, Rivera seeks review of the FBI's decision pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–706. He argues that the FBI's refusal to allow the search is arbitrary and capricious; that it is inconsistent with the purposes of the federal DNA Identification Act; that it violates Rivera's right of access to the courts; and that it is contrary to the FBI's own mission. The FBI argues that its refusal to proceed is an appropriate exercise of its discretion, to which this court must defer. For the reasons set forth below, the court directs the FBI to proceed with the manual keyboard search.

### DISCUSSION

■ The APA permits the court to overturn agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "contrary to constitutional right power, privilege or immunity." 5 U.S.C. § 706(2)(A), § 706(2)(B). The Act authorizes the district court, on review, to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. 706(1). In support of his request that this court enter such an order, Rivera asserts, first, that the FBI's refusal to conduct the keyboard search is inconsistent with the purpose of the DNA Identification Act, 42 U.S.C. § 14131, *et seq.*, which was adopted to assist local law enforcement officers in solving crimes and in exonerating persons mistakenly accused or convicted. Second, Rivera contends the FBI's refusal to allow the search violates his constitutional right of access to the courts because it prevents him from discovering evidence that could exonerate him. Third, Rivera asserts that the FBI's position in this case is inimical to its stated mission of protecting local communities from criminal conduct, as it "allows the possibility that the man who raped and murdered an eleven-year-old girl continues to roam free in our community," in addition to the possibility that an innocent person may be wrongly convicted. (Plaintiff's Memorandum in Support of His Complaint, at 5.) The FBI contends that it has developed Operational Procedures to assure the highest quality standards for the operation of the National DNA Index System ("NDIS") and that the search Plaintiff has requested would violate those procedures, which are entitled to deference. In assessing these arguments, the court first considers the language of the relevant statute and procedures developed by the agency to implement it, and then focuses on the keyboard search requested here.

### DNA Identification Act

Both sides have devoted attention to the language of the federal DNA Identification Act, 42 U.S.C. § 14131 *et seq.* (hereinafter, "DNA Act" or the "Act"). The DNA Act, adopted in 1994, granted the FBI authori-

ty to establish a national DNA databank for law enforcement purposes. In its current form, the Act provides for the Director of the FBI to appoint an advisory board charged with the responsibility of developing quality assurance standards for DNA analyses performed by forensic laboratories. 42 U.S.C. § 14131. It provides, further, that to facilitate exchange of DNA identification information by law enforcement agencies, the FBI Director will establish an index of DNA identification records for persons charged with or convicted of crimes. 42 U.S.C. § 14132(a). The Act limits the records it will maintain within that index to samples based on analyses performed on behalf of criminal justice agencies in accordance with quality assurance standards established by the FBI. 42 U.S.C. § 14132(b)(1). Laboratories that perform the analyses are required to be accredited by nationally-recognized forensic scientists and must undergo external audits at least every other year. 42 U.S.C. § 14132(b)(2). The criminal justice agencies that contribute DNA samples to the FBI index must adhere to rules that permit disclosure of the samples in limited circumstances, including disclosure "for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged." 42 U.S.C. § 14132(b)(3)(C). The Act provides, further, that the Director of the FBI will promptly expunge the DNA analysis of any arrestee who is not convicted or any convicted person whose conviction is overturned. 42 U.S.C. § 14132(d).

### NDIS Operating Procedures

Douglas R. Hares, the custodian of the National DNA Index System ("NDIS") and Acting Unit Chief of the FBI's Combined DNA Index System ("CODIS"), submitted a declaration in support of the FBI's motion for summary judgment.

Hares Declaration ¶ 1. In his declaration, Hares provides further information concerning the NDIS and how it is administered. Hares explains that CODIS is a software system developed to facilitate the flow of DNA information from state and local laboratories to the FBI's national DNA index. *Id.* ¶ 7. According to Hares, the "purpose of NDIS is to generate leads for the law enforcement community." *Id.* ¶ 9. In order to participate in NDIS, a forensic laboratory is required to meet quality assurance standards developed by the DNA Advisory Board and must be accredited by one of two independent accrediting bodies: the American Society of Crime Laboratory Directors/Laboratory Accreditation Board (ASCLD/LAB)-International or Forensic Quality Services–International. Hares Declaration, ¶¶ 18–20. Mr. Hares asserts that the FBI has resisted efforts to reduce its quality standards and that adherence to those strict standards "is one of the primary reasons that NDIS has operated successfully for a decade." *Id.* ¶ 22.

The CODIS software automatically runs a search on a weekly basis to identify potential matches between biological samples found at crime scenes and offenders whose DNA samples are already in the system. *Id.* In addition to this automatic weekly search, under certain circumstances the NDIS custodian can authorize a "manual keyboard search." *Id.* ¶ 10. In its current form, the DNA Act itself does not address the matter of manual keyboard searches. An earlier version of the Act did define the term "keyboard search" as "a search under which information obtained from a DNA sample is compared with information in the index without resulting in the information obtained from a DNA sample being included in the index." 42 U.S.C. § 14132(e)(2), *repealed by* Pub.L. No. 109–162, § 1002(4) (2006). That earlier version also said little about

when and under what circumstances such a search will be performed. Instead, the NDIS Procedures Board—composed of representatives of local, state, and federal law enforcement agencies—has developed certain internal guidelines, known as Operational Procedures, governing such searches. *Id.* ¶ 12. These Operational Procedures have not been formally adopted as federal regulations and are not publicly available; the copy that appears in the Administrative Record in this case is marked "Law Enforcement Sensitive—Do Not Disseminate." (Operational Procedures, Administrative Record (hereinafter "A.R.") at 30–40.) Mr. Hares interpreted the Operational Procedures in his declaration; in addition, the court has reviewed the Operational Procedures themselves.

The Operational Procedures state that a manual keyboard search "may" be initiated by the NDIS Custodian on request, so long as the request complies with the DNA Act, the Privacy Act, and "other applicable legislation/regulation." (Operational Procedures, A.R. at 31–2 ¶ 4.0.) It states further that "if the search can be conducted," the NDIS staff "shall" perform it. *Id.* Mr. Hares asserted that under the Operational Procedures, only a local law enforcement agency may request a manual keyboard search, and that such a request must be made through the CODIS State Administrator, who is responsible for en-

suring that laboratories within the state comply with FBI regulations for participation in the DNA index. Hares Decl. ¶ 13. The Operational Procedures themselves do state, in one section, that the NDIS Custodian will "only respond to [keyboard] requests from [state officials]. . . ." (Operational Procedures, A.R. at 32, ¶ 4.1.) In another section, however, the Operational Procedures explicitly contemplate requests from "any source other than a criminal justice agency," and impose limitations on disclosure of the results: disclosure in judicial proceedings and disclosure to a defendant in a criminal proceeding are expressly permitted. (*Id.* ¶ 4.4.)[1] Citing this provision, Mr. Hares acknowledges that the Operational Procedures also permit the NDIS custodian to accept a DNA profile generated by a private laboratory pursuant to a court order. Hares Decl. ¶ 17. He contends, however, that the Operational Procedures require that any DNA data submitted for a manual keyboard search must still be certified as having been submitted by an accredited laboratory. *Id.* ¶ 14.

As Mr. Hares recognizes, not every keyboard search will result in addition of the searched DNA profile into the NDIS. Mr. Hares described two circumstances in which a manual keyboard search may be performed: first, where "law enforcement

---

1. The provision at issue states, in full:

 **4.4 All Other Requests**
 If requests are received from any source other than a criminal justice agency, the keyboard search will only be performed if the request is pursuant to a court order and in compliance with the DNA Indemnification Act, which authorizes:
 "... disclosure of stored DNA samples and DNA analyses only—
 (A) to criminal justice agencies for law enforcement identification purposes;
 (B) in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules;
 (C) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged; or
 (D) if personally identifiable information is removed, for a population statistics database, for identification research and protocol development purposes, or for quality control purposes."
 The request will be handled as stated in paragraph 4.3. A copy of the court order must be attached to the request letter.

has developed a DNA profile of a violent criminal and believes there is a possibility that the offender may commit another crime before the routine automatic [weekly] search is conducted." *Id.* ¶ 16(a). In these circumstances, the DNA profile will ultimately be entered into the NDIS. *Id.* Second, a manual keyboard search may be performed when a law enforcement agency has obtained a DNA profile that has fewer "loci" (that is, specific locations on chromosomes, used as markers for identification purposes) than are normally required. *Id.* ¶ 16(b). Such a profile may be the subject of the manual keyboard search, but because it is not of the appropriate technical quality, it will not ultimately be included in the NDIS. *Id.* Significantly, it is undisputed that the keyboard search Rivera seeks in this case would also not result in inclusion of any new DNA profile in the NDIS.

Defendant contends that the Operational Procedures contemplate that only a federal court may issue an order that directs the performance of a manual keyboard search. *Id.* ¶ 17. In support of this assertion, Hares cites a checklist (presumably drafted by the NDIS Procedures Board), to be completed by persons seeking a keyboard search. The Operational Procedures themselves appear to be less specific: as noted, the Operational Procedures provide for a manual keyboard search at the request of "any source other than a criminal justice agency," so long as the request is made pursuant to a "court order" (no limitation here to federal courts) and "in compliance with the DNA Identification Act." (Operational Procedures, A.R. at 32, ¶ 4.4.) Significantly, the DNA Identification Act provisions to which the Operational Procedures refer are those that limit disclosure of DNA analyses. The Procedures note explicitly that disclosure is permitted "in judicial proceedings" and "for criminal defense purposes." (*Id.*) As noted, the Act itself does impose quality control standards on the DNA records maintained in the index; it does not impose quality control standards on DNA profiles that will be the subject of a manual keyboard search.

### Dr. Blake's DNA Analysis

The Administrative Record includes two reports from Edward T. Blake of Forensic Science Associates. Dr. Blake's reports explain that he obtained evidence from the crime scene, including a semen sample obtained from the vagina of Holly Staker and cells from the victim's body, from the Illinois State Police Crime Lab in January 2005. Dr. Blake performed polymerase chain reaction (PCR)-based DNA typing of the sperm sample and developed a genetic profile that he characterizes as "highly discriminating"; in fact, it is "expected to be unique in the human population." (February 15, 2005 Report from Forensic Science Associates, A.R. at 74.) He labelled the individual who deposited the semen in Holly Staker as "Unknown Male # 1." *Id.* In addition, Dr. Blake developed a genetic profile for the female cells that came from the victim's body. *Id.* Dr. Blake then compared the DNA profile he obtained from the sperm deposit against DNA developed from oral swabs from Mr. Rivera. Dr. Blake concluded from this comparison that Mr. Rivera cannot be Unknown Male # 1; that is, Juan Rivera is eliminated as the source of the sperm ejaculated into the victim's body. (March 25, 2005 Report from Forensic Science Associates, A.R., at 102–103.) Dr. Blake concludes his second report by saying that the genetic profile for Unknown Male # 1 "can be employed to search local and national violent offender libraries in an effort to identify Unknown Male # 1." (*Id.*) It is this genetic profile for which Plaintiff seeks a manual keyboard search of the national DNA index.

The crux of the FBI's accreditation concern is the fact that Edward T. Blake, the forensic scientist who examined the semen sample from Holly Staker's vagina, refuses to apply for accreditation for his laboratory from the private organizations on whom the FBI relies.[2] Nothing in the record, however, suggests any other reason to question Mr. Blake's credentials, which appear to be unimpeachable. According to Mr. Blake's *curriculum vitae*, he has a doctorate in criminology from the University of California, Berkeley; performed a two-year fellowship with the Department of Justice, studying the determination of genetic markers in human semen; and has been awarded research grants from DOJ to study genetic markers in semen. He has written dozens of articles and given scores of presentations about DNA analysis, including several for the FBI Academy in Quantico, Virginia. *See* http://www.fsalab.com/etb—cv.htm, last visited February 2, 2009. Internet sources report that Dr. Blake has been considered an expert in DNA analysis for many years. He claims to be the first to use PCR-based DNA testing in the United States, in civil litigation in 1986. Since then, he has worked as a consultant analyzing biological evidence in "countless criminal cases, including work that has led to the exoneration of approximately fifty people wrongly accused of crimes." *See* http://www.enotes.com/forensic-science/blake-edward-t, last visited February 2, 2009.

Nor has the FBI identified any concerns regarding the integrity of Mr. Blake's analysis of the DNA sample in this case. As reflected in the Administrative Record, the Lake County State's Attorney asked William Frank, the DNA Research Coordinator for the Illinois State Police Research and Development Laboratory, to review Dr. Blake's work for quality control. Frank confirmed that the DNA profile from Unknown Male # 1 identified by Dr. Blake is suitable for comparison. (Letter of William E. Frank, March 9, 2005, A.R. at 47–48.) Assistant State's Attorney Michael Mermel also asked the Illinois State Police Laboratory to replicate Dr. Blake's work, using biological material from the crime scene that had not been sent to Dr. Blake. (Letter of Mike Mermel, March 22, 2005, A.R. at 50.) The "low level" profile that Mr. Frank developed also excluded Juan Rivera as the potential source of the sperm from the vaginal swab taken from the victim. (Letter of William E. Frank, May 16, 2005, A.R. at 52–53.) Local law enforcement officials accepted Dr. Blake's analysis and compared the profile he developed against the Illinois State DNA Index and the Wisconsin State DNA Index, both of which are maintained by accredited laboratories; neither comparison detected a match. (Answer ¶¶ 10, 11; Letter of Donald R. Parker, Illinois State CODIS Administrator, October 25, 2005, A.R. at 55; E-mail message from Dan J. Haase, December 6, 2005, A.R. at 57.)

On July 24, 2008, the Presiding Judge in the Circuit Court of Lake County entered an order directing the FBI to perform the comparison that Rivera has requested. That order states, in part, as follows:

> The interests of justice would be advanced if the identity of the person whose genetic profile matches that of the Sperm were known, and a retrial might be avoided. This information in conjunction with other forensic facts previously established, may isolate the

---

**2.** Although the record is silent on the matter, the court presumes Rivera's attorneys were unaware of the accreditation concern at the time they retained Dr. Blake (undoubtedly at significant expense) in 2005. The record does not explain why Dr. Blake, a preeminent expert, has not sought accreditation for his laboratory.

individual responsible for the murder and rape of an eleven year old child. At a minimum, the identity of the Sperm donor may lead to his prosecution for violating certain other sexual assault criminal statutes.

. . .

Both the State's Attorney of Lake County and Defendant's lawyers believe it is in the interests of justice that FBI personnel search the genetic profile [developed by Dr. Blake] against CODIS.

The court concluded by ordering "appropriate FBI personnel to search the genetic profile ... against CODIS, and to notify the Court in writing of the result." (July 24, 2008 Order of Christopher C. Starck, Ex. 7 to Plaintiff's Complaint, at 2–3.)[3]

*Analysis*

The Supreme Court has explained that a federal court may compel agency action only where it is both discrete and legally required. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). There appears to be no dispute that the manual keyboard search Plaintiff desires is a discrete act. The FBI contends that such a search is not legally required; but the detailed procedures it has adopted for a manual keyboard search, as well as the language of those Operational Procedures ("If the search can be conducted, the NDIS Custodian shall perform a manual keyboard search ...") leave little room for the conclusion that such a search is wholly discretionary. Nor has the FBI suggested that a DNA Index developed at significant public expense should not be utilized to identify the perpetrator of the violent rape and murder of a child.

Instead, the focus of the FBI's argument here is on the fact that the profile to be searched was not developed by an accredited laboratory that meets or exceeds the quality assurance standards that the agency has developed, as directed by the Act. Dr. Blake, who developed the DNA profile Plaintiff seeks to have tested, has not sought review of his laboratory by the two independent accrediting bodies on which the FBI relies. Under the deference this court owes to the agency's final decision, the FBI contends, its refusal to test a profile developed by Dr. Blake must be upheld.

 In reviewing agency action under the Administrative Procedures Act, the court presumes the agency's action to be valid and will not substitute its judgment for that of the agency. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Instead, the court confines its analysis to determining whether the agency's decision is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Deference to the agency's decision is particularly appropriate where the agency has adopted policies to implement a statute that Congress has delegated to the agency, or where the policies concern a "complex and highly technical" program, entail significant expertise, or call for the exercise of judgment grounded in policy concerns. *Thomas Jefferson Univ. v. Shalala,* 512

---

**3.** The Order attached to the complaint is date-stamped July 24, 2007; it nevertheless appears from the findings of fact in that order that it was entered some time after July 20, 2008, when Donald R. Parker of the Illinois State Police reported the results of the search of the Illinois DNA Index. *See* Donald R. Parker letter July 20, 2008, Exhibit 6 to Plaintiff's Complaint.

U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

Under the familiar *Chevron* test, the court asks, first, "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If Congress has done so, and its intent is clear, "that is the end of the matter." *Id.* Where the statute is silent or ambiguous, however, the court asks whether the agency's interpretation "is based on a permissible construction." *Id.* at 843, 104 S.Ct. 2778. If it is, so long as the agency's determination is reasonable, the court "should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* at 845, 104 S.Ct. 2778 (citation omitted).

As the FBI Director has acknowledged, "the DNA Identification Act is silent with respect to the requirements that must be met in order for the FBI to conduct a manual keyboard search." (Memorandum in Support of Defendant's Motion for Summary Judgment (hereinafter, "FBI Mem."), at 13.) The Director acknowledges, further, that the Operational Procedures on which he relies here were developed internally rather than through notice-and-comment procedures; thus, as "less formal pronouncements" they "may or may not be entitled to *Chevron* deference." *Krzalic v. Republic Title Co.,* 314 F.3d 875, 879 (7th Cir.2002) (quoting Richard J. Pierce, Jr., *Administrative Law Treatise* § 3.5, at 6–7 (4th ed. Supp.2003)); *accord White v. Scibana,* 390 F.3d 997, 1000 (7th Cir.2005). Even so, the Director contends, deference to those Procedures is appropriate here because the matter at issue is a technical one, involving "important and complex legal and scientific issues requir-

ing a high degree of expertise." FBI Mem. at 14, 15.

■ The court should defer to an administrative agency's implementation of a statute where it appears that Congress delegated authority to the agency to make rules that carry the force of law. *See United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Interpreting *Mead* and other precedents, the *Krzalic* court explained that the "deference due a less formal pronouncement" appears to depend on judicial consideration of "an apparently open-ended list of factors" that may express congressional intent. 314 F.3d at 879. In that case, the Seventh Circuit declined to defer to a policy statement issued by the Department of Housing and Urban Development that interpreted a provision of the Real Estate Settlement Procedures Act. Similarly, in *Sehie v. City of Aurora,* 432 F.3d 749 (7th Cir.2005), the Seventh Circuit rejected the defendant's reliance on opinion letters issued by the Department of Labor concerning the appropriate interpretation of the Fair Labor Standards Act. 432 F.3d at 753 (7th Cir.2005) ("opinion letters—like interpretations contained in policy statements, agency manual, and enforcement guidelines, . . . lack the force of law [and therefore] do not warrant *Chevron*-style deference.") (citing *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)).

Recognizing that the FBI's interpretations are entitled to respect, if not to deference, the court is not satisfied that the requirements it has imposed here are "reasonable in light of the legislature's revealed design." *Lopez v. Davis,* 531 U.S. 230, 242, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001). The FBI has admitted that the DNA Act does not prohibit the keyboard search Rivera has requested. Nor would such a search be costly or time-consuming.

(Answer ¶ 17.) Instead, Mr. Hares has explained that Rivera's request for a manual keyboard search was denied because the request did not come from a CODIS State Administrator and was not generated by a state or local criminal justice agency or accompanied by a federal court order requiring the search. And the DNA profile for which a search is requested was not generated by an accredited laboratory, one that meets quality assurance standards. (Hares Decl. ¶ 27.) As explained below, the court finds this reasoning unpersuasive.

First, the court considers the FBI's insistence that it will perform a keyboard search only at the request of the state DNA Index Administrator. The DNA Act itself makes no reference to keyboard searches, but nothing in the Act's language suggests that access to such a powerful tool as the NDIS must be so limited. Moreover, the FBI's own Operational Standards contemplate keyboard searches at the request of criminal justice agencies and of "other sources," so long as the request is made pursuant to a court order. The FBI's position here—that Mr. Rivera is not entitled to a keyboard search absent the involvement of particular state officials—puts a criminal defendant at the mercy of state law enforcement authorities, who sadly may not be motivated or able to pursue a reopened investigation. In this case, in any event, the state prosecutor supports Rivera's request for a search, and the state trial court has signed a detailed order compelling it.

Nor is the court persuaded that the court order required for a keyboard search can be issued only by a federal court. Again, the Act itself does not address the matter, but the Operational Standards themselves use the words "court order," without any suggestion that a state court order is insufficient. Federal courts have significant criminal dockets, but prosecutions for such crimes as rape and murder are unusual. It would be anomalous if the national DNA databank, used in particular to identify perpetrators of violent crimes or exclude suspects, were available only at the behest of those courts least likely to be venues for prosecution of such crimes. Nor is it reasonable to require parties in a state court case to repair to the federal court in order to obtain data necessary for prosecution or defense of a violent crime. The databank surely is intended for use in state criminal prosecutions; thus the only reasonable interpretation of the term "court order" is the literal one—that is, the order of any court.

The FBI's most significant concern is the matter of laboratory compliance with quality assurance standards. There can be no question of the importance of those standards in assuring the integrity and usefulness of the NDIS. It is undisputed that the DNA Act does impose quality assurance standards on DNA profiles *maintained in* the FBI's CODIS databank. It does not, however, impose any such standards on DNA profiles that will be *compared with* the profiles in the databank, but not formally included in that databank. (Answer ¶ 24.) Mr. Hares's declaration demonstrates that the FBI recognizes a distinction between the nature and quality of profiles that can be tested, on the one hand, and those of sufficient precision and quality to become part of NDIS, on the other: He explained that, at the request of a law enforcement agency, a manual keyboard search may be performed on a DNA profile that has fewer chromosomal "loci" than are normally required. Where this occurs, the inferior-quality profile can be tested, but will not be included in the national databank. The FBI has not contested Plaintiff's assertion that testing the DNA profile Dr. Blake developed could not contaminate or

alter the databank in any way. Notably, neither the administrator of the Illinois State DNA Laboratory nor the administrator for the Wisconsin State DNA Laboratory (both accredited labs) hesitated to test Dr. Blake's profile against their own databanks. Nor has the FBI offered any scientific support for its suggestion that running the keyboard search Plaintiff requests would create "a heightened risk of false positives or false negatives." (FBI Mem. at 18.) The FBI's refusal to perform the keyboard search itself creates the largest potential for "false negatives." And although poor quality control might result in the loss or destruction of DNA material, there is simply no basis for the conclusion that a poorly-prepared slide or incomplete analysis might generate a "match" to a DNA profile in the CODIS.

In a footnote, the FBI has urges that the manual keyboard search Mr. Rivera is requesting would not in any event provide evidence that is "crucial" to Rivera's defense on the criminal charges. (FBI Mem. at 20 n. 14.) If a match were found, the FBI asserts, NDIS would only "notify the contributing agency" of the match, and would not release the name or other identifying information concerning the source of the matching DNA. (Hares Decl. ¶ 30.) Respectfully, the court disagrees with the FBI's assumption that the fact that Dr. Blake's profile matched that of another individual would be of little value to Mr. Rivera. However compelling a name might be, the mere fact of a match to someone other than Juan Rivera by itself could be the basis for a powerful argument on the part of his attorneys at trial.

### *CONCLUSION*

Petitioner Rivera hopes a manual keyboard search of the FBI index will yield a match with the profile developed by Dr. Blake. Such a match, he believes, would be persuasive evidence not only that Mr. Rivera was not the rapist and murderer of Holly Staker, but that another individual is the guilty party. As explained above, the search Rivera is requesting would compare the Unknown Male # 1 profile against the FBI index, not make that profile part of the index. The court thus concludes that the FBI acted arbitrarily in refusing to proceed with the keyboard search.

The petition for an order compelling the search is granted. The FBI is directed to proceed forthwith to perform a manual keyboard search of the DNA profile for Unknown Male # 1.